**RHODE ISLAND LIQUOR STORES ASSOCIATION**

v.

**The EVENING CALL PUB. CO. d.b.a. The Woonsocket Call.**

**No. 84–566–A.**

Supreme Court of Rhode Island.

Aug. 26, 1985.

Bruce E. Vealey and Alan T. Dworkin, Alan T. Dworkin, Ltd., Cranston, for plaintiff.

William R. Grimm and Michael A. Silverstein, Hickley Allen Tobin & Silverstein, Providence, for defendant.

## OPINION

KELLEHER, Justice.

This is an appeal from a Superior Court judgment upholding the constitutionality of G.L. 1956 (1976 Reenactment) § 3–8–8.1, which essentially prohibits the Rhode Island media from publishing any liquor-price information.[1] At issue, for the second time

---

1. General Laws 1956 (1976 Reenactment) § 3–8–8.1 provides:

"3–8–8.1. **Price advertising unlawful.**—No newspaper, periodical, radio or television broadcaster or broadcasting company or any other person, firm or corporation with a principal place of business in the state of Rhode Island which is engaged in the business of advertising or selling advertising time or space shall accept, publish, or broadcast any advertisement in this state of the price or make reference to the price of any alcoholic beverages. Any person who shall violate any of the provisions of this section shall be guilty of a misdemeanor and shall be punished for the first offense by a fine in the sum of fifty dollars ($50.00) and for each additional offense thereafter by a fine not exceeding the

this term,[2] is the question of whether a state statute prohibiting dissemination of liquor-price information violates the Federal Constitution.

The facts of this case are not in dispute, the parties having previously consented to have the trial justice pass on the constitutionality of § 3–8–8.1 upon an agreed statement of facts. By its complaint, plaintiff Rhode Island Liquor Stores Association (the association) seeks to permanently enjoin the Woonsocket Call (the Call), from soliciting or publishing advertisements setting forth the price of alcoholic beverages. Judicial involvement with this case dates back to June 17, 1975, when a Superior Court justice denied the association's request for a preliminary injunction, asserting that the statute was "presumptively unconstitutional." In a written decision filed in November 1984 another trial justice permanently enjoined the Call "from any solicitation, acceptance or publication of any advertisement of the price or which shall make reference to the price of any alcoholic beverages." Subsequently, on December 18, 1984, a third Superior Court trial justice granted the Call's motion to suspend the injunction pending appeal to this court. We then denied a motion by the association to restore the injunction pending appeal. However, since we conclude that § 3–8–8.1 is a constitutionally valid exercise of the state's police power, the Call's appeal is denied and the judgment permanently enjoining the Call from publishing liquor-price advertisements is affirmed.

The parties' agreed statement of facts reveals that the Call, on or about June 4, 1975, published within the State of Rhode Island an advertisement for Labonte's Package Store, a Massachusetts retailer of alcoholic beverages whose place of business is Millville, Massachusetts.[3] Millville, a south-central Massachusetts community adjoining our northern border, is a short drive from Woonsocket, North Smithfield, and other northern Rhode Island communities. This advertisement displayed a list of various alcoholic beverages and stated the trade name as well as the price of each item for sale. The truthfulness of the information in the advertisement is not in issue. The agreed statement of facts further reveals that this advertisement directly violates § 3–8–8.1. Finally, the Call acknowledges that it has "continued to publish such advertisements."

On this appeal the Call argues that the entry of a permanent injunction was improper because there was no showing by the association that it would suffer irreparable injury absent such relief. The newspaper also urges us to find that § 3–8–8.1 impinges upon First Amendment freedoms by abridging the right of the press to publish truthful commercial speech. Rounding out its constitutional attack, the Call argues that the statute violates the commerce clause because it is "protectionist legislation" enacted to shield Rhode Island liquor retailers from out-of-state price competition. We shall first address the Call's contention that the trial justice erred in granting the permanent injunction because

sum of one hundred dollars ($100). Publication or broadcast by any person in violation of the provisions of this section shall also be subject to injunctive proceedings in a court of competent jurisdiction on a complaint brought by a retail licensee, or an association of retail licensees.

"The provisions of this section shall not apply to any trade journal which is duly recognized and authorized to be exempt from the provisions of this section by the liquor control administrator."

2. A case challenging the constitutionality of § 3–8–7 is also being published today. *S & S*

*Liquor Mart, Inc. v. Pastore,* 497 A.2d 729 (R.I., 1985). Unlike § 3–8–8.1, which restrains the media from publishing liquor-price information, § 3–8–7 prohibits liquor-license holders from any off-premises advertising of alcoholic-beverage prices.

3. The last four paragraphs of the parties' agreed statement of facts illustrate that Massachusetts liquor laws, compared with parallel Rhode Island legislation, are more favorable to liquor retailers. For instance, the Commonwealth of Massachusetts, unlike Rhode Island, has no statute prohibiting the advertising of prices of alcoholic beverages by retailers.

the association failed to demonstrate that it would suffer irreparable injury absent such equitable relief.

In considering this phase of the Call's appeal, it is important to keep in mind that the parties consented to have the trial justice pass on the association's prayer for a permanent injunction upon an agreed statement of facts. In the case before us now, the Call complains that the trial justice made no finding that the association was threatened with irreparable harm from the Call's advertising. It also argues that such a finding could not have been made because both the complaint and the evidence failed to address the issue of irreparable harm.

It is our belief, however, that since the Call agreed to have the trial justice decide the case on an agreed statement of facts, it has implicitly conceded that the association has standing to seek an injunction permanently enjoining the Call from soliciting or publishing advertisements setting forth the price of alcoholic beverages. It is inconsistent for the Call first to consent to have the constitutionality of § 3–8–8.1 determined on an agreed statement of facts and then later to claim that the resulting injunction was improperly granted because the association failed to demonstrate that it would suffer irreparable injury absent such equitable relief. If in fact the Call believed that the association lacked standing to challenge the newspaper's dissemination of alcohol-price information, it should have voiced its objection at the trial-court level in lieu of proceeding on an agreed statement of facts. Since we conclude that the entry of the permanent injunction was proper, we may now turn to the constitutional questions involved in this case.

The Call contends that the liquor-price advertising at issue in this case is commercial speech[4] entitled to First Amendment protection and that § 3–8–8.1 does not survive the intermediate level of constitutional scrutiny articulated by the Supreme Court in *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). The association apparently concedes that § 3–8–8.1 proscribes commercial speech, but it urges us to uphold the constitutionality of the statute because it complies with the four-facet *Central Hudson* test. It is evident that both parties, and indeed the trial justice, are of the belief that *Central Hudson* is the dispositive authority on the issues in this case. We also base our decision, ultimately, upon the application of the Supreme Court's analysis in *Central Hudson.*

"The protection available for particular commercial expression turns on the nature both of the expression and of the governmental interests served by its regulation." *Central Hudson*, 447 U.S. at 563, 100 S.Ct. at 2350, 65 L.Ed.2d at 349. With this balancing test in mind, the Court adopted a four-facet analysis for assessing the validity of restrictions on commercial speech. That analysis can be summarized as follows: (1) is the commercial speech protected by the First Amendment; that is, does it concern lawful activity, and is it not misleading? (2) is the asserted governmental interest substantial? (3) does the regulation directly advance the governmental interest asserted? and (4) is the regulation more extensive than is necessary to serve the governmental interest?

**4.** The Supreme Court extended the protection of the First Amendment to commercial speech in *Bigelow v. Virginia*, 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975). Before that time, purely commercial advertising received no First Amendment protection. *See Valentine v. Chrestensen*, 316 U.S. 52, 54, 62 S.Ct. 920, 921, 86 L.Ed. 1262, 1265 (1942). Later Supreme Court decisions on commercial expression have rested on the principle that such speech, although deserving protection, is of less constitutional significance than other forms of speech. As the Court noted in *Ohralik v. Ohio State Bar Assn.*, 436 U.S. 447, 456, 98 S.Ct. 1912, 1918, 56 L.Ed.2d 444, 453 (1978), the failure to distinguish between commercial and noncommercial speech "could invite dilution, simply by a leveling process, of the force of the [First] Amendment's guarantee with respect to the latter kind of speech."

There is no dispute in the instant case that the commercial speech in question involves lawful activity. As we indicated in *S & S Liquor, see* note 2, *supra,* the sale and the consumption of alcoholic beverages are lawful within the State of Rhode Island. General Laws 1956 (1976 Reenactment) title 3. Also, the veracity of this pricing information is not an issue in this case.

In *S & S Liquor* we had "little difficulty in finding that the asserted governmental interests, herein described as the promotion of temperance and the reasonable control of the traffic in alcoholic beverages" were substantial. Both § 3–8–7, which was under attack in *S & S Liquor,* and § 3–8–8.1, the subject of review in the instant case, are part of the same title, the declared purpose of which is "the promotion of temperance and for the reasonable control of the traffic in alcoholic beverages." General Laws 1956 (1976 Reenactment) § 3–1–5. Thus the asserted governmental interests supporting each section are identical.

■ The Call, although conceding that these "purported" state objectives are substantial, argues that the limited nature of the advertisement ban chosen is so grossly disproportionate to the stated goal as to raise substantial doubts about the statute's real purpose.[5] But a valid exercise of legislative power will not be invalidated because certain legislators may have had invalid motives (protecting in-state liquor retailers from out-of-state price competition) when the legislation in question was enacted. *Holmes v. Farmer,* —— R.I. ——, ——, 475 A.2d 976, 988–89 (1984) (Kelleher, J., concurring). The declared purpose of title 3 here, as in *S & S Liquor,* reflects the "*asserted* governmental interest." In determining the constitutionality of a governmental intrusion on protected commercial speech, *Central Hudson* instructs that we look to the "asserted governmental interest," not the hypothetical political motiva-

tion. *Central Hudson,* 447 U.S. at 566, 100 S.Ct. at 2351, 65 L.Ed.2d at 351. Once again, we have "little difficulty" in finding that the asserted governmental interests are substantial.

■ The crucial question in this case, as it was in *S & S Liquor,* is whether the statute survives analysis under the third facet of the *Central Hudson* test. Stated more specifically, does the price-advertisement ban directly advance the state's interests in promoting temperance and controlling the traffic in alcoholic beverages? Our brother Weisberger apparently believes that § 3–8–8.1 is at best an indirect means of advancing Rhode Island's interests. But we do not read *Central Hudson* as requiring us to determine whether Rhode Island has chosen the best means to advance its interests; rather, the focus of the inquiry is whether the means chosen by the Legislature, despite the existence of other, perhaps more efficient means, directly advance the asserted state interests. *Oklahoma Telecasters Association v. Crisp,* 699 F.2d 490, 500 (10th Cir.1983), *rev'd on other grounds sub nom.,* —— U.S. ——, 104 S.Ct. 2694, 81 L.Ed.2d 580 (1984).

■ In *S & S Liquor,* this court noted, citing *Boucher v. Sayeed,* —— R.I. ——, 459 A.2d 87 (1983), that an individual challenging a legislative judgment may attack its constitutionality by directing the court's attention to various facts that could be categorized as either legislative facts or adjudicative facts. We noted that *S & S Liquor,* the party challenging the constitutionality of the statute, "ha[d] not demonstrated that uncontrolled advertising of the price of liquor poses no threat to the legislative goal of alcoholic moderation or abstinence." The Call is similarly situated in this case. It proceeded in the Superior Court on an agreed statement of facts. Thus, there was not even an attempt by the Call to prove by expert testimony, as was

---

5. Rhode Island permits liquor advertising as long as no price information is provided the consumer, and § 3–8–8.1 prohibits only the Rhode Island press from publishing liquor-price information.

done in *Lamar Outdoor Advertising, Inc. v. Mississippi State Tax Commission,* 539 F.Supp. 817 (S.D.Miss.1982), that advertising only affected brand loyalty and market share. In essence, the Call asks us to strike down the constitutionality of § 3-8-8.1 because of an intuitive belief that information concerning the price of alcohol does not result in tipplers' tippling more intoxicants. This we refuse to do. Indeed, although we can perhaps perceive more effective means for achieving the state's goal of temperance, we do not find it unreasonable for the State of Rhode Island to believe that price advertising will result in increased sales of alcoholic beverages generally. *Oklahoma Telecasters Association,* 699 F.2d at 501; *Queensgate Investment Co. v. Liquor Control Commission,* 69 Ohio St.2d 361, 433 N.E.2d 138, *appeal dismissed for want of a substantial federal question,* 459 U.S. 807, 103 S.Ct. 31, 74 L.Ed.2d 45 (1982).[6] We would also point out that a more restrictive statutory scheme for reducing alcoholic consumption, such as a total ban on liquor advertising, would increase the risk that the statute violated the fourth facet of the *Central Hudson* analysis, relating to the extensiveness of the regulation.

As the Call itself notes, "The statute prohibits *only* the intrastate press from publishing liquor price information *only.*" (Emphasis in original.) As long as no price information is provided the consumer, the state permits all liquor advertising. The Call also points out that the state permits out-of-state newspapers, magazines, and other publications to publish and circulate in Rhode Island. Although a blanket prohibition of all liquor advertising would provide a stronger basis for arguing that the price-advertising ban is more extensive than necessary to serve the state interest, it certainly cannot be said that the state, in

this case, has gone further than necessary in seeking to meet its ends. Consequently, we are of the opinion on the record before us that § 3-8-8.1 is a valid restriction on commercial speech and thus does not violate the Call's First Amendment rights.

In this opinion we do not concern ourselves with the sobriety of Massachusetts readers of the Call. Rather, since the Call is published in Woonsocket, our concern extends to the residents of Rhode Island who will travel to Millville, purchase liquor, then return to Rhode Island, in due course engage in a bit of imbibing, and ultimately drive on Rhode Island highways. The Legislature, through its enactment of § 3-8-8.-1, manifests a concern that the dissemination of liquor-price information to Rhode Islanders by the Rhode Island media could result in increased consumption of alcoholic beverages by Rhode Islanders within the boundaries of this state. The Legislature's vital and continuing interest in the control and supervision of liquor traffic, grounded on the police power of the state, is necessarily confined within the frame established by our state borders. We are keenly aware that the price advertising in the case at bar involves a retail liquor establishment located in the Commonwealth of Massachusetts. Insofar as that business concern seeks to hawk its wares within our borders, enticing Rhode Islanders to purchase intoxicating liquors in the Commonwealth for eventual consumption in Rhode Island, it has circumvented a proper exercise of police power. Compared to the state's interests, the economic interests of the Call and Labonte's Package Store are minimal, and in our view the state's interests should prevail.

■ In *Linmark Associates, Inc. v. Township of Willingboro,* 431 U.S. 85, 97 S.Ct. 1614, 52 L.Ed.2d 155 (1977), the Court struck down, on First Amendment grounds,

---

**6.** Our brother Weisberger, in his dissent, emphasizes at great length that the United States Supreme Court's summary dismissal in *Queensgate Investment Co. v. Liquor Control Commission,* 69 Ohio St.2d 361, 433 N.E.2d 138 (1982), "is not controlling in the instant case." We have no

difficulty whatsoever in agreeing with his analysis with respect to this issue, particularly his observation that the issues decided in *Queensgate* differ significantly from the issues presented in the case now before us.

a township ordinance prohibiting the posting of real estate "For Sale" and "Sold" signs. The ordinance was enacted for the purpose of stemming what the township perceived as the flight of white homeowners from a racially integrated community. Justice Marshall, speaking for the Court, described the constitutional defect in the ordinance: "The Township Council here * * * acted to prevent its residents from obtaining certain information * * * of vital interest to Willingboro residents, since it may bear on one of the most important decisions they have a right to make * * *." *Id.* at 96, 97 S.Ct. at 1620, 52 L.Ed.2d at 164. In its brief the Call cites *Willingboro* for the proposition that the state bears the burden of justifying any regulation of commercial speech. To the extent the Call believes that *Willingboro* mandates that, in a commercial-speech case, a state regulation must survive all four facets of the *Central Hudson* test (instituted after *Willingboro*) or be declared unconstitutional, we agree. Insofar as the Call considers the proposition as requiring the state to demonstrate, with expert or other testimony, that increased sales of alcoholic beverages correlate highly with the dissemination of liquor-price information, then we disagree.[7]

The Supreme Court has often admonished that each First Amendment case must be analyzed separately, based on the specific method of communication involved, and the values and the dangers implicated. *Metromedia, Inc. v. City of San Diego,* 453 U.S. 490, 501, 101 S.Ct. 2882, 2889, 69 L.Ed.2d 800, (1981); *Federal Communications Commission v. Pacifica Foundation,* 438 U.S. 726, 748, 98 S.Ct. 3026, 3039, 57 L.Ed.2d 1073, 1092 (1978). In *Willingboro* Justice Marshall described the information that the township sought to suppress as being of "vital interest" to the residents of the community. Unlike the ban in *Willingboro,* portrayed as having an impact on an important life decision, suppression of liquor-price information could only result in, at best, reduced liquor sales and at times additional expenditures by consumers for their alcoholic-beverage purchases. Considering the values and dangers implicated by § 3-8-8.1, we are convinced that the *Central Hudson* balancing test here tips in favor of the state.

In its final effort to relegate § 3-8-8.1 to the legislative junk heap, the Call claims that the law violates the commerce clause because it is "protectionist legislation" enacted to shield Rhode Island liquor retailers from out-of-state price competition. As mentioned previously, the Commonwealth of Massachusetts, unlike Rhode Island, does not prohibit liquor retailers from advertising the price of their wares. In support of its argument that there are "substantial indications" that the primary purpose of § 3-8-8.1 is to protect Rhode

---

**7.** In her dissent Justice Murray takes the position that we have placed the burden of proof on the wrong party. In support of her position Justice Murray cites a footnote in *Bolger v. Youngs Drug Products Corp.,* 463 U.S. 60, 71 n. 20, 103 S.Ct. 2875, 2882 n. 20, 77 L.Ed.2d 469, 480 n. 20 (1983), where the Court stated that "[t]he party seeking to uphold a restriction on commercial speech carries the burden of justifying it." In *Bolger* the Court struck down 39 U.S.C.A. § 3001(e)(2), a law prohibiting the mailing of unsolicited contraceptive advertisements.

Ordinarily, as noted in *Dunagin v. City of Oxford, Mississippi,* 718 F.2d 738, 745 (5th Cir. 1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 3553-54, 82 L.Ed.2d 855 (1984), the burden of justifying a regulation of speech, even commercial speech, rests on the party defending such a restriction. But in *Dunagin* the Fifth Circuit also instructs that any analysis of a state statute regulating liquor must presuppose that the regulation is a legitimate exercise of legislative power. This is so because of the "added presumption in favor of the validity of the state regulation" conferred by the Twenty-first Amendment, *California v. LaRue,* 409 U.S. 109, 118, 93 S.Ct. 390, 397, 34 L.Ed.2d 342, 352 (1972). *See Dunagin,* 718 F.2d at 744-45. *Bolger* is therefore distinguishable in the instant case because the Twenty-first Amendment strengthens Rhode Island's existing police power in the area of liquor regulation. We thus remain convinced that our analysis with respect to the allocation of the burden of proof in this case was a correct application of the Twenty-first Amendment in the context of a commercial-speech case.

Island liquor retailers from price competition, the Call directs our attention to the fact that liquor retailers are given specific authority to enforce the statute. The Call also informs us that, shortly after passage of the statute, a state representative described as "the law's prime sponsor" stated in a local newspaper that the statute was enacted to counteract the competitive advantage enjoyed by out-of-state liquor retailers. Although we agree that these assertions might introduce some doubt concerning the nexus between § 3-8-8.1 and the asserted state interests contained in § 3-1-5, doubt alone about invalid legislative motives is not a sufficient basis upon which to rest a decision that legislation is unconstitutional. *Holmes v. Farmer,* —— R.I. at ——, 475 A.2d at 988-89.

In *Bacchus Imports, Ltd. v. Dias,* —— U.S. ——, 104 S.Ct. 3049, 82 L.Ed.2d 200 (1984), the Court declared unconstitutional a Hawaii liquor-tax statute that exempted from taxation certain locally produced alcoholic beverages. Justice White, speaking for the Court, held that the liquor-tax exemption violated the commerce clause "because it had both the purpose and effect of discriminating in favor of local products." *Id.* at ——, 104 S.Ct. at 3057, 82 L.Ed.2d at 211. The Court had previously observed that it was "undisputed" that the purpose of the exemption was to aid Hawaiian industry. The Call cites *Bacchus* for the proposition that a "finding that state legislation constitutes 'economic protectionism' may be made on the basis of either discriminatory purpose * * * or discriminatory effect * * *." *Id.* at ——, 104 S.Ct. at 3055, 82 L.Ed.2d at 208. In an apparent effort to demonstrate the Legislature's discriminatory purpose, the Call refers us to the "substantial indications" that underscore its belief that the legislation constitutes economic protectionism. The Call has failed in its effort. Succinctly stated, our belief is that there is a lack of an evidentiary record upon which we can base a finding that § 3-8-8.1 constitutes economic protectionism. Perhaps if the Call had proceeded to trial with this case, instead of assenting to

its disposition by the trial justice on the basis of an agreed statement of facts, it could have presented relevant evidence concerning the statute's discriminatory purpose or discriminatory effect. On the basis of this record, however, we are unable to make such a determination.

The Call's appeal is denied and dismissed, the judgment permanently enjoining the Call from accepting or publishing any advertisements that refer to, or list, the price of any alcoholic beverage is affirmed, and the papers of the case are remanded to the Superior Court with directions to enter judgment in accordance with this opinion.

WEISBERGER, Justice, dissenting.

I am unable to join the majority in upholding a judgment of the Superior Court enjoining a newspaper from publishing liquor advertisements of a Massachusetts retailer of alcoholic beverages whose place of business is located in Millville, Massachusetts, and not within the State of Rhode Island.

The majority cites in a peripheral comment *Queensgate Investment Co. v. Liquor Control Commission,* 69 Ohio St.2d 361, 433 N.E.2d 138, *appeal dismissed,* 459 U.S. 807, 103 S.Ct. 31, 74 L.Ed.2d 45 (1982). It could be argued that the dismissal of the appeal by the Supreme Court of the United States for lack of a substantial federal question forecloses further inquiry because of the similarity of issues between that case and the case at bar. Although the majority does not analyze *Queensgate* to any extent, I feel it necessary to point out in some detail that it is not controlling in the instant case. At the threshold it is appropriate to point out that there is a significant difference between *Queensgate* and the instant case. In *Queensgate* the Ohio Liquor Control Commission brought action against a liquor licensee who sought to declare unconstitutional as violative of the First Amendment an Ohio statute prohibiting liquor-price advertising in that state. It is notable that the issue in

*Queensgate* was the right of a licensed liquor dealer to advertise by means of its own newsletter the prices of alcoholic drinks to be sold to customers within that state. The issue in the case at bar is the right of a newspaper to publish an advertisement from an out-of-state liquor dealer which includes the prices of alcoholic beverages to be sold within the Commonwealth of Massachusetts. I consider these issues to be very different indeed.

The Supreme Court has sent a number of messages to state courts and lower federal tribunals concerning the precedential authority of cases dismissed for want of a substantial federal question. In *Hicks v. Miranda*, 422 U.S. 332, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975), the Court stated that such a dismissal constitutes a decision on the merits. We recognized and applied this doctrine in *Loiselle v. City of East Providence*, 116 R.I. 585, 588, 359 A.2d 345, 347 (1976). However, the Supreme Court has also noted that blind application of its rule in *Hicks* is to be avoided. In *Mandel v. Bradley*, 432 U.S. 173, 97 S.Ct. 2238, 53 L.Ed.2d 199 (1977), the Court held, per curiam, that such summary dispositions extended only to "the precise issues presented and necessarily decided by those actions." *Id.* at 176, 97 S.Ct. at 2240, 53 L.Ed.2d at 205. In his concurring opinion in *Mandel*, Justice Brennan extended the analysis even further by noting that,

> "the federal and state courts should give 'appropriate, but not necessarily conclusive, weight to our summary dispositions,' * * *. [Moreover, a] detailed analysis * * * is essential before a decision can be made whether it is appropriate to accord a particular summary disposition precedential effect. After today, judges of the state and federal systems are on notice that, before deciding a case on the authority of a summary disposition by this Court in another case, they must (a) examine the jurisdictional statement in the earlier case to be certain that the constitutional questions presented were the same and, if they were, (b) determine that the judgment in fact rests

upon decision of those questions and not even arguably upon some alternative nonconstitutional ground. The judgment should not be interpreted as deciding the constitutional questions unless no other construction of the disposition is plausible. In other words, after today, 'appropriate, but not necessarily conclusive, weight' is to be given this Court's summary dispositions." *Mandel*, 432 U.S. at 179–80, 97 S.Ct. at 2242, 53 L.Ed.2d at 207 (quoting *Colorado Springs Amusements, Ltd. v. Rizzo*, 428 U.S. 913, 923, 96 S.Ct. 3228, 3233, 49 L.Ed.2d 1222, 1226 (1976)).

In subsequent decisions since *Mandel*, the Court has continued to urge caution in order to avoid too broad an application of the rule announced in *Hicks, supra.* See *Anderson v. Celebrezze*, 460 U.S. 780, 784 n. 5, 103 S.Ct. 1564, 1567 n. 5, 75 L.Ed.2d 547, 555 n. 5 (1983); *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 499–500, 101 S.Ct. 2882, 2888–89, 69 L.Ed.2d 800, 810 (1981); *see also Washington v. Confederated Bands and Tribes of the Yakima Indian Nation*, 439 U.S. 463, 476 n. 20, 99 S.Ct. 740, 749 n. 20, 58 L.Ed.2d 740, 753 n. 20, *reh. denied*, 440 U.S. 940, 99 S.Ct. 1290, 59 L.Ed.2d 500 (1979). In *Illinois State Board of Elections v. Socialist Workers Party*, 440 U.S. 173, 182–83, 99 S.Ct. 983, 989, 59 L.Ed.2d 230, 240 (1979), the Supreme Court noted that "[a] summary disposition affirms only the judgment of the court below * * * and no more may be read into our action than was essential to sustain that judgment. * * * Questions which 'merely lurk in the record,' * * * are not resolved, and no resolution of them may be inferred."

An examination of the stipulated facts in the case at bar, as opposed to the facts set forth in ˙*Queensgate*, will clearly indicate that the issues decided in the Ohio case are significantly different from the issues presented in the instant case. One of the salient differences is that the party defendant in this case is a newspaper as opposed to a licensed liquor dealer. Another signifi-

cant difference is that the price advertising in the case at bar involves a liquor establishment located in the Commonwealth of Massachusetts wherein such price advertising is not prohibited by statute.[8] The advertising in *Queensgate* related to an Ohio licensee who distributed its message by newsletter. The case at bar differs in principle from that of *Queensgate, supra.* In *Queensgate* the party who asserted a First Amendment right was a liquor licensee as opposed to the publisher or editor of a newspaper. The Supreme Court noted in *Bigelow v. Virginia,* 421 U.S. 809, 828, 95 S.Ct. 2222, 2236, 44 L.Ed.2d 600, 615 (1975), that application of a statute prohibiting publication of commercial speech against a "publisher and editor of a newspaper, not against the advertiser or a referral agency or a practitioner * * * incurred more serious First Amendment overtones" than would otherwise be the case. In short, the prohibition against the publication of advertising by a newspaper involves far more serious issues than the inhibition of publication by an advertiser, particularly a liquor licensee. It has earlier been observed by the Supreme Court that licensees may be restricted in accordance with the license that gives rise to their business activity and which they freely accepted as a condition of doing business. Thus, a Fourth Amendment right may be restricted or limited in regard to a licensee of a pervasively regulated business. *See Donovan v. Dewey,* 452 U.S. 594, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981) (mine operator); *United States v. Biswell,* 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972) (licensee of firearm dealership).

Furthermore, it is the teaching of *Bigelow* that,

"[a] State does not acquire power or supervision over the internal affairs of another State merely because the welfare and health of its own citizens may be affected when they travel to that State. It may seek to disseminate information so as to enable its citizens to make better informed decisions when they leave. But it may not, under the guise of exercising internal police powers, bar a citizen of another State from disseminating information about an activity that is legal in that State." *Bigelow,* 421 U.S. at 824–25, 95 S.Ct. at 2234, 44 L.Ed.2d at 613.

In the case at bar, the Rhode Island judiciary purports to enjoin a newspaper from disseminating advertising from Massachusetts liquor dealers (a practice valid in that state) under the guise of promoting temperance among its own citizens. The command of *Bigelow* would inhibit such an action and would render invalid such an application of G.L. 1956 (1976 Reenactment) § 3–8–8.1.

As a further reason for my dissent, I am of the opinion that the majority has misconceived the full thrust of the holding in *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). In that case, as the majority also points out, a New York Public Service Commission regulation completely banned promotional advertising by an electric utility in order to dampen, on conservation grounds, the enhanced use of electricity. This regulation was declared to be in violation of the First Amendment protection granted to commercial speech because of overbreadth and insufficient direct relationship to the conservation of energy. Justice Powell, speaking for the majority, developed a four-part test in order to determine the validity of regulations inhibiting commercial speech or publication. This four-part test was as follows:

1. Does the speech concern lawful activity and is it not misleading in nature?

2. Is the governmental interest substantial?

3. If the foregoing questions are answered affirmatively, does the regulation directly advance the governmental interest asserted?

---

**8.** *See* stipulation of fact, No. 13.

4. Is the regulation more extensive than is necessary to serve that interest? *Central Hudson,* 447 U.S. at 566, 100 S.Ct. at 2351, 65 L.Ed.2d at 351. I agree completely with the majority that the crucial question in this case concerns the third inquiry. Does the regulation directly advance the governmental interest asserted?

In my opinion it does not accomplish such a result. In the case at bar, it is almost obvious beyond question that not only is the attempted control of purchasing decisions made by Rhode Island residents in the State of Massachusetts beyond the power of this state to control, as pointed out in *Bigelow, supra,* but also it could scarcely be suggested that it has the desired effect of promoting the elusive concept of temperance. Even applying an intermediate level of judicial scrutiny to this state's restriction upon advertising as applied in this case could scarcely support the requirement that the state interest is directly advanced. Under the Rhode Island statute, restrictions on price advertising are the only means by which the state allegedly supports its interest in promoting temperance. Rhode Island does not purport to prevent pervasive advertising via newspaper, radio, billboard, and other publication forms extolling the virtues of various brands of beer, wine, and "ardent spirits." The suggestion of the pleasures to be derived from the consumption of such nectars proceeds uninhibited by any countervailing state interest in the promotion of temperance. At most, it might be argued that price advertising, even by Rhode Island dealers, affects the choice of the place where the consumer decides to purchase liquor and not the basic decision whether to purchase.

It should also be noted that in *Central Hudson,* Justice Blackmun in his concur-ring opinion made an exceedingly pertinent observation in respect to price information when he stated:

"I seriously doubt whether suppression of information concerning the availability and price of a legally offered product is ever a permissible way for the State to 'dampen' demand for or use of the product. Even though 'commercial' speech is involved, such a regulatory measure strikes at the heart of the First Amendment. This is because it is a covert attempt by the State to manipulate the choices of its citizens, not by persuasion or direct regulation, but by depriving the public of the information needed to make a free choice." *Central Hudson,* 447 U.S. at 574–75, 100 S.Ct. at 2356, 65 L.Ed.2d at 356 (Blackmun, J., concurring).

I believe that this observation by Justice Blackmun points up quite eloquently the difference between this case and the case of *Dunagin v. City of Oxford, Mississippi,* 718 F.2d 738 (5th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 3553, 82 L.Ed.2d 855 (1984), in which the United States Court of Appeals for the Fifth Circuit found valid a Mississippi regulation that imposed a ban on liquor advertising save for limited on-premises identification of the place of business and its purpose. The crucial difference between the restrictions found in *Dunagin* and those contained in the Rhode Island statute is that when a virtually total prohibition of alcohol advertising is imposed, a much closer nexus must exist between such a prohibition and a state's interest in promoting temperance.

The majority suggests that a statute is presumed to be constitutional and the burden of persuasion rests upon those who would challenge its validity.[9] It is further

---

9. Although this is a familiar principle in Rhode Island constitutional adjudication, language in some recent cases indicates that the United States Supreme Court may place the burden of establishing the need for restricting a First Amendment right in order to achieve a substantial governmental interest upon the proponents rather than the opponents of the legislation. *See Bolger v. Youngs Drug Products Corp.,* 463 U.S. 60, 71 n. 20, 103 S.Ct. 2875, 2882 n. 20, 77 L.Ed.2d 469, 480 n. 20 (1983); *Central Hudson Gas & Electric Corp. v. Public Service Comm'n of New York,* 447 U.S. 557, 570, 100 S.Ct. 2343, 2353, 65 L.Ed.2d 341, 353 (1980); *Linmark Asso-*

true that in *Boucher v. Sayeed,* —— R.I. ——, 459 A.2d 87 (1983), we pointed out the distinction between the taking of judicial notice of adjudicative facts and that of legislative facts. Therein we declared that legislative facts are "the social, economic, political, and scientific facts that simply supply premises to guide judges in the process of their legal reasoning. In particular, judicial notice of such facts may occur when a judge decides upon the constitutionality of a statute." *Id.* at ——, 459 A.2d at 92.

I feel constrained to note, however, that legislative facts are generally applied as a matter of intuitive judgment even though it may be that there is an absence of specific statistical data to prove or disprove a given proposition. For example, in *Boucher* no statistical or other factual information was supplied to support the finding that the medical malpractice crisis had passed. Even reams of statistics, like beauty, depend upon the eye of the beholder. Other than the application of intuitive judgment, I do not believe that the effect upon temperance of price advertising is susceptible of "proof" in the ordinary sense of that term. In my judgment the enforced silence regarding price serves to dampen legitimate competition rather than the thirst of potential consumers.

For the foregoing reasons, I must respectfully dissent from the opinion of the majority. I would hold without equivocation that the application of the Rhode Is-

land statute to the defendant Evening Call Publishing Company under the circumstances of this case is a violation of the First Amendment protection accorded commercial speech.

MURRAY, Justice dissenting.

I am in consonance with the views expressed by my brother Weisberger. My dissent briefly articulates a response to the majority's proposition which, in my view, places the burden of proof on the inappropriate party. In *Bolger v. Youngs Drug Products Corp.,* 463 U.S. 60, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983), the United States Supreme Court cited *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980), the case principally relied upon by the majority, for the proposition that *"[t]he party seeking to uphold a restriction on commercial speech carries the burden of justifying it."* (Emphasis added.) *Bolger,* 463 U.S. at 71 n. 20, 103 S.Ct. at 2882 n. 20, 77 L.Ed.2d at 480, n. 20 (also citing *Linmark Associates, Inc. v. Township of Willingboro,* 431 U.S. 85, 97 S.Ct. 1614, 52 L.Ed.2d 155 (1977)). Succinctly, and for the reasons amply documented in the majority opinion, the Rhode Island Liquor Stores Association has not satisfied this burden. The record is devoid of evidence which indicates that G.L. 1956 (1976 Reenactment) § 3–8–8.1 furthers the state's purported goal of encouraging temperance.[10]

*ciates, Inc. v. Willingboro,* 431 U.S. 85, 95, 97 S.Ct. 1614, 1619, 52 L.Ed.2d 155, 163 (1977).

**10.** I feel constrained to comment on the rather odd alignments that have developed in this case and which have thus far been ignored. Why does plaintiff, an organization whose members earn their livelihood through the retail sale of intoxicating beverages, seek to enforce a statute that discourages the retail sale of those very same intoxicating beverages? I think the answer to this question goes to the heart of the issue of whether G.L. 1956 (1976 Reenactment) § 3–8–8.1 does in fact further the state's purported goal of "promoting temperance" (which really means "discouraging the retail sales of intoxicating beverages"). Given the record before this court, and my conclusion that the

burden of proof lies with plaintiff, I can only conclude that § 3–8–8.1 affects *patterns* of consumption, not *volume* of consumption. The Rhode Island Liquor Stores Association is concerned, and understandably so, that the advertisements at issue in this case are costing its members customers. The underlying motives of this case have nothing to do with the "promotion of temperance" among Rhode Island citizens, but rather with the promotion of price ignorance. The plaintiff seeks to retain its members' market share by withholding price information from Rhode Island citizens. I am inclined to "view as dubious any justification [for the suppression of commercial speech] that is based on the benefits of public ignorance." *Bates v. State Bar of Arizona,* 433 U.S. 350, 375,

Further, I am unpersuaded by the argument that the Twenty-first Amendment acts to shift the burden of justification from those who would suppress truthful commercial speech to those who would engage in such speech simply because the speech involves an area in which the state has broad regulatory powers. *See Hostetter v. Idlewild Bon Voyage Liquor Corp.*, 377 U.S. 324, 84 S.Ct. 1293, 12 L.Ed.2d 350 (1964). Those powers provide the *authority* for regulation of traffic in liquor. It is my considered opinion that they do not provide the *justification* for individual acts of regulation, especially when such regulation suppresses truthful and nonmisleading commercial speech. Such justification can only be established by evidentiary facts, none of which appear in the record before us.

I would hold that § 3–8–8.1 is an unconstitutional restraint on the freedom of speech as guaranteed by the First and Fourteenth amendments. I must therefore respectfully dissent from the majority opinion.

97 S.Ct. 2691, 2704, 53 L.Ed.2d 810, 830 (1977) (citing *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976)). Given the present factual setting and alignment of parties, I am even more dubious of the statute's purported justification.